CHAPMAN, *Adm'r of Nutter*, *Plaintiff in Error* v. CALLAHAN *et al:*

1. **Who are Proper Parties to a Vendor's lien suit.** An administrator sold and conveyed several parcels of land, part of a larger tract, and received the purchase money for the same. His intestate had previously conveyed the entire tract to another party. In a suit by the administrator to enforce a vendor's lien against the entire tract for the purchase money due upon this sale; *Held*, that the purchasers at the administration sale were proper parties defendant.

2. **Vendor's Lien:** DEFENSE OF FRAUDULENT CONVEYANCE. To defeat such a suit, the purchasers at the administration sale may show that no debt was incurred by the grantee in the deed from the intestate, and for this purpose will be allowed to prove that this deed was made without consideration, and in order to hinder and defraud the creditors of the intestate.

3. ————: ESTOPPEL BY PLEA : HUSBAND AND WIFE. A defendant in a vendor's lien case cannot, after a verdict against him upon a plea of payment, avail himself of evidence that he had never contracted to pay for the land, given upon an issue of non-assumpsit made between the plaintiff and other defendants in the case; and where husband and wife are defendants, and the husband has no other interest than as tenant by the courtesy in the land of which his wife is owner, a verdict so rendered affects his interest equally with hers, although he may, in a separate answer, have pleaded non-assumpsit, and, upon a trial, the plea may have been found in his favor.

*Error to Jackson Circuit Court.*—HON. SAMUEL L. SAWYER, Judge.

This was a suit brought by Chapman as administrator of Samuel W. Nutter, deceased, against Lizzie A. Callahan, a sister of the deceased, and James M. Callahan, her husband, to enforce a vendor's lien against a tract of land in Lafayette county. The case was taken by change of venue from Lafayette to Jackson county. The petition alleged that the land had been conveyed by plaintiff's intestate to Mrs. Callahan for the sum of $13,000, and that although the deed acknowledged receipt of the money, yet; in point of fact, no part of it had ever been paid.

Defendants answered, admitting the purchase, but

averring payment in full. The court submitted to a jury the question whether Mrs. Callahan had ever paid the purchase money, and the jury returned a verdict in the negative. After the rendition of this verdict, on motion of the original defendants, and against the objection of plaintiff, Hall and Jordan were made co-defendants, and on his own motion, James M. Callahan was permitted to file a separate answer, but Mrs. Callahan was not permitted to answer further. Hall and Jordan filed separate answers, each admitting the sale and conveyance to Mrs. Callahan, but denying that she ever promised to pay for the land, and averring that the deed was made by Nutter, and was accepted by her with intent to hinder, delay and defraud his, Nutter's, creditors; also, averring that they had purchased portions of the land at a sale made by plaintiff, as administrator of Nutter, under orders of the probate court, and that the money paid by them had been applied by plaintiff to the payment of the debts of the intestate. Defendant, James M. Callahan, also set up the fraudulent character of the conveyance to his wife, but disclaimed any participation in the fraud, or any knowledge of it, until the facts were developed on the trial before the jury, the transaction having occurred before his marriage.

Plaintiff replied to these answers, denying all the allegations of fraud, and charging Jordan with combining with Callahan and wife in the matter of the alleged administrator's sale. The deed was executed in July, 1868. Previous to that time a suit for divorce had been brought against Nutter by his wife, and an order had been made in her favor, allowing her $250 alimony *pendente lite*. Nutter was killed in October, 1868, and plaintiff was appointed his administrator.

At the trial several witnesses testified that deceased had owed them small sums ranging from $10 to $60 for groceries, clothing, &c., which they had tried, without success, to get paid during the summer and fall of 1868. Plaintiff testified that a few days after the death of Nut-

ter, he, in company with witnesses, went to his late residence for the purpose of making an inventory of the effects. Mrs. Callahan was there: she had been living with him; she pointed out the property inventoried, and said it was all, that deceased had no other property, that she knew of no money. He further testified that the proceeds of the sale to Hall and Jordan had been used to pay the debts of the estate, amounting to some $6,000; that Mrs. Callahan's father died in 1865, leaving her 200 acres of land, some household furniture, a few farm animals and $1,000 in money. The inventory made by the witness consisted of a small amount of personalty only.

Judge Carr testified that he accompanied plaintiff when he made the inventory; that Mrs. Callahan pointed out a few articles only as the property of deceased; that she was engaged in no business; and deceased was engaged in none other than farming, not in any kind of speculation.

Another witness testified that she had been the wife of Samuel W. Nutter; that Mrs. Callahan had lived with them; that in 1868 Mrs. Callahan owned the property left her by her father, but had no income from it, and always said she had no means of paying board or building on her own land.

Another witness testified that he lived near deceased, and that after July, 1868, deceased, on one occasion, came to him to borrow money.

Thomas Wood, a nephew of Mrs. Callahan, testified that in April, 1868, he was at Nutter's house, and saw Mrs. Callahan open a trunk; there was a large pile of money in it; a while before Nutter's death, he saw him with a large amount of money in his pocket book; he said he had sold his farm, and got the money; that Nutter often told him this, giving as his reason for selling his fear of being killed, and saying he intended to move out of the country; Mrs. Callahan was in possession of the farm.

Thomas Pollard testified that he had once been a tenant of Nutter; in 1868 he had applied to Nutter to rent

the same place again; Nutter said he would like to, but had sold to Mrs. Callahan; he would try to get her to let witness have it back again : he said. "All I now have is a pocket full of money; If you want some, I will let you have it." He had his pocket full at that time; his outside coat pocket was plump full of loose money; saw him pulling it out of his inside coat pocket too.

Dennis O'Reilly testified that in the fall of 1868 he had applied to Nutter to rent land, and had received the same answer as the last witness; that he afterwards got the land from Mrs. Callahan, who wrote the lease herself.

Thos. Adamson sheriff testified that he had levied on a buggy and horse as the property of Nutter, that he had denied the ownership, saying he had sold everything to Mrs. Callahan; that she afterwards replevied them.

Several attorneys testified that Nutter owed them for professional services in his divorce and other cases; that they had made attempts to collect their accounts in the spring and summer of 1868, but Nutter would laugh and say he had nothing to pay with just then; that they had subsequently brought attachment suits, and recovered the amounts from his administrator.

Xenophon Ryland testified that he was present at the administrator's sale, and that Jordan and James M. Callahan seemed to be acting in concert.

Mrs. Callahan testified : I never assented to the sale of any portion of said lands for the purpose of paying debts. Plaintiff suggested this course, but I told him I had bought the lands and paid my money for them, and I would not consent to any of them being sold for this purpose. I bought the property of my brother, and paid him all the money for it at once. I paid him seventeen thousand dollars in cash. I paid him thirteen thousand dollars for the lands and four thousand for the personal property. The deed for the lands was made out and delivered to me and filed for record before I paid the money, and the bill of the personal property was also delivered to me before I paid

the money.   On cross-examination, she stated :  I paid the money at home.   The deed was executed in Lexington, and filed for record on the same day.   No money was paid at the time the deed was executed.   I cannot tell how many days it was after the deed was executed before I paid the money, but it was not many.   A man by the name of Daniel Hogan was present when the money was paid, but no one else.   Hogan lived near us.   My brother went and brought him to our house to witness the payment of the money.   I went into another room and brought out $13,000 and counted it out for the land, and then went and got $4,000 more and counted it out for the personal property.   I had none of this money at the time I went to St. Louis in the fall of 1867, or when I came back in the spring of 1868.

Question by plaintiff:   State where you got the $17,-000 which you say you paid to your brother?   Counsel for defendants here suggested that if the witness could not answer this question without criminating herself, she would be excused for not answering it, and the court then instructed the witness accordingly.   Whereupon the witness testified as follows :  I cannot answer this question, or state where I got any portion of this $17,000 without criminating myself.

Daniel Hogan testified, that he came one day to Nutter's house and he had a deed which he said he had had written in Lexington on the day before. She brought in some money and paid it.  I don't know how much it was.   He said it was paid for the land and the stock and household furniture.   The money was paid in the house where they lived.   I did not count it.   I don't know whether it was good, bad or indifferent.   I heard them saying that it was thirteen thousand dollars for the land, and four thousand dollars for the stock and household and kitchen furniture.   This payment occurred on Sunday in the parlor.   They were in the sitting room when I went there, and they asked me to go into the parlor with them.   No one else was pres-

ent. They were making two payments, one in the morning and one in the evening. I can't read, and did not read the deed. They said it was a deed. I saw the money in the morning. I am not certain whether both payments were made in the morning or whether one was made in the morning and one in the evening. I do not know whose money was paid, or who kept it, or what became of it after it was paid. I do not know that any money changed hands and remained changed. I know Richard Carr. He lived a mile south of Wellington, and I expect I said to him there was "damned little" money passed. I didn't know how much it was. They were sitting at a round table. I was sitting at the end of the table. She counted and handed the money to him. I don't know what she did with it, or where he put it. They were so close that what one could handle the other could handle. I heard them counting, but took no heed. I don't know whether it was hundred or one dollar bills. I know a one dollar bill from a five or ten. I don't know a hundred dollar bill. I don't know whether the money was hundred dollar bills, or tens, or ones. I don't know what any of the bills were. They called on me to witness the payment.

It was admitted by the parties, and received in evidence, that at the time of the execution of the deed by intestate to Mrs. Callahan, he was indebted to his father's estate in the sum of $2,000, for which judgment was rendered against plaintiff, after intestate's death, and paid. It was likewise admitted that the larger portion of the debts allowed against and paid out of intestate's estate accrued before, and were due at the time of the execution of the deed by him to Mrs. Callahan, and that at the time of such execution, a divorce suit was pending against him, in which a judgment for $250, as alimony, *pendente lite*, had been rendered, and was then unpaid. Upon all the evidence the court found for defendants, and entered judgment accordingly. The plaintiff appealed.

*Botsford & Williams* and *Lay & Belch* for plaintiff in error.

I. The maxims, *ex turpi causa non-oritur actio* and *in pari delicto potior est conditio defendentis* do not apply to actions for the purchase money of goods or lands sold with intent to defraud creditors; and the almost universal construction of the statute of 13 Eliz., Ch. 5, has been that such conveyances are valid between the parties, and as to all the world, except creditors, and can be enforced in all their terms, either in law or equity, and without reference as to whether they are executed or executory, the same as any other contract. *Hawes v. Leader* Cro. Jac. 270; Yelv. 196; *Cadogan v. Kennett*, Cowp. 432, 434; *Roberts v. Roberts*, 2 Barn. & Ald. 367; 2 Chitty on Contracts, (11 Am. Ed.,) 1037; *Lenox v. Notrebe*, Hemp. C. C. 251; *Randall v. Philips*, 3 Mason 378; *Hamilton v. Russell*, 1 Cranch 314; *Brooks v. Martin*, 2 Wall. 70; *Nichols v. Patton*, 18 Me. 231; *Thompson v. Moore*, 36 Me. 47; *Andrews v. Marshall*, 43 Me. 272; *Blake v. Williams*, 36 N. H. 39; *Carpenter v. McClure*, 39 Vt. 9; *Roberts v. Lund*, 45 Vt. 82; *Cushwa v. Cushwa*, 5 Md. 44; *Broughton v. Broughton*, 4 Rich. (S. C.) 492; *Lassiter v. Cole*, 8 Humph. 621; *Stanton v. Green*, 34 Miss. 576; *Hoeser v. Kraeka*, 29 Tex. 450; *Davis v. Ransom*, 26 Ill. 100; *Fitzgerald v. Forristal*, 48 Ill. 228; *Morey v. Forsyth*, Walker's Chan. (Mich.) 465; *Smith v. Mining Co.* 14 Cal. 242; *Lawton v. Gordon* 34 Cal. 36; *Swan v. Scott*, 11 Serg. & R. 155; *Sherk v. Endress*, 3 W. &. S, 255; *Murphy v. Hubert*, 16 Penn St. 50; *Evans v. Dravo*, 24 Penn. St. 62; *Hendrickson v. Evans*, 25 Penn. St. 441; *Drum v. Painter*, 27 Penn. St. 148; *Byrod's Appeal*, 31 Penn. St. 241; *Williams v. Williams*, 34 Penn. St. 312; *Pearsoll v. Chapin*, 44 Penn. St. 9; *Gillispie v. Gillispie*, 2 Bibb 89; *Gilpin v. Davis*, 2 Bibb 416; *Bibb v. Baker*, 17 B. Mon. 292; *Drinkwater v. Drinkwater*, 4 Mass. 354; *Fairbanks v. Blackington*, 9 Pick. 93; *Dyer v. Hamer*, 22 Pick. 253; *Harvey v. Varney*, 98 Mass. 118; *Findley v. Cooley*, 1

Blackf. 262; *Springer v. Drosch*, 32 Ind. 486; *O'Neil v. Chandler*, 42 Ind. 471; *Clemens v. Clemens*, 28 Wis. 637; *Dietrich v. Koch*, 35 Wis. 618; *Starke v. Littlepage*, 4 Rand. 368; *Harris v. Harris*, 23 Gratt. 787; 1 Story Eq. Jur. (11th Ed.,) § 371; *Henderson v. Henderson*, 13 Mo. 151; *Gowan v. Gowan*, 30 Mo. 472; *Wright v. Crockett*, 7 Mo. 127; *Burrows v. Alter*, 7 Mo. 424; *Smoot v. Wathen*, 8 Mo. 522; *McLaughlin v. McLaughlin*, 16 Mo. 242; *Brown v. Finley*, 18 Mo. 378; *Criddle v. Criddle*, 21 Mo. 522; *George v. Williamson*, 26 Mo. 190; *Johnson v. Jeffries*, 30 Mo. 423; *Reid v. Mullins*, 48 Mo. 344. The maxims cited are inapplicable, for the reason given by both Chief Justice Shaw and Chief Justice Dixon, that the transaction as between the parties not being *turpis causa*, there was no wrong between them, equal or unequal. Or, as is well said by Chief Justice Gibson, the party is not allowed to make this defense, not because he is not permitted to plead his own criminality, but because there is no criminality to plead. The sale, therefore, by Nutter to Mrs. Callahan was not void as between them, and plaintiff as Nutter's administrator, has the right to recover the purchase money. Especially so, as Nutter's creditors have been paid in full.

II. Jordan and James M. Callahan, not being either creditors or subsequent purchasers of Nutter, do not stand in a position to set up the fraud. *Russell v. Kearney*, 27 Ga. 96; *Bell v. McCauley*, 29 Ga. 355; Kerr on Fraud & Mist. 228, 229; *Railroad Co. v. Seeger*, 4 Wis. 268; *Bailey v. Tipton*, 29 Mo. 206; *Johnson v. Jeffries*, 30 Mo. 423; *Reid v. Mullins*, 48 Mo. 344; *St. Louis v. Shields*, 52 Mo. 351. Callahan is joined with his wife merely as a nominal party, and his courtesy in the land is subject to plaintiff's lien for the purchase money, the same as though Mrs. Callahan had mortgaged the land before their marriage.

III. The title to the land having been conveyed to Mrs. Callahan, before the administration purchases by Hall and Jordan of Nutter's interest, those purchases were void, and they, having acquired neither title not possession,

were not necessary parties. *George v. Williamson*, 26 Mo. 190; *Callahan v. Griswold*, 9 Mo. 785; *Delassus v. Poston*, 19 Mo. 425; *Farrar v. Dean*, 24 Mo. 16; *Trent v. Trent*, 24 Mo. 307; *Grady v. McCorkle*, 57 Mo. 172; *Cape Girardeau Co. v. Harbison*, 58 Mo. 90; *Erfort v. Consalus*, 47 Mo. 208.

IV. Every issue tendered by the answer of Mrs. Callahan having been decided against her by the verdict of the jury, and she having been denied permission to amend by setting up the fraud of herself and Nutter, the court erred in rendering a decree in her favor on the issues tendered, and the evidence adduced by the other parties.

*A. Comingo* for defendants in error.

I. Hall and Jordan were not only proper, but were necessary parties. They had purchased from the plaintiff, as administrator, a large part of the lands against which he was seeking to enforce a vendor's lien; and had received deeds, and were in actual possession. Furthermore, the money they had paid, had been used by the plaintiff to pay the debts of intestate. They, therefore, had interests and equities in the premises which it was the duty of the court to protect. Wag. Stat., p. 1000, § 5; *Dillon v. Bates*, 39 Mo. 292. If plaintiff had had a vendor's lien, as he alleged, he might not have been estopped from enforcing it, by the sale he had made under the order of the probate court, in pursuance of his own petition. It is not necessary to determine that question here. It is enough to know that he had once sold the property, or a large part of it, and received the money, and put his vendee in possession, &c. It would be a strange equity that would permit him to sell it again under a vendor's lien, without affording his prior vendee an opportunity to be heard.

II. The finding and judgment of the court were for the right parties. In the first place, the testimony in the cause, not only fails to show that S. W. Nutter retained or intended to retain a vendor's lien, but it utterly fails to

show that he, at the time of his death, had any claim either in law or equity against his sister. Furthermore, the testimony shows conclusively that he did not retain or intend to retain such lien, and that he did not have any such claim. The remarkable facts and circumstances disclosed by the testimony, conclusively repel the presumption of a lien in favor of S. W. Nutter, the vendor, and utterly annihilate his pretended equities. *Garson v. Green,* 1 John., Ch. 308; *Gilman v. Brown,* 1 Mason 192.

His oft repeated declarations, that the purchase money had been paid, are alone sufficient to repel the presumption of a vendor's lien. Although it may not have been actually paid, it seems he considered and treated the payment made in the presence of the witness Hogan, as an actual payment, and, in view of the facts in the case, he could not, if living, nor will the plaintiff, as his administrator, be permitted to treat it otherwise. The evidence that the conveyance by Nutter to his sister, was made with intent to defraud, hinder and delay creditors and others, is overwhelming. A vendor's lien in the case is therefore impossible. Wag. Stat. 461, § 51, 464, § 66.

The vendor's lien cannot exist if the contract is by statute illegal. *Ewing v. Osbaldistone,* 2 Mylne & Craig 53, 88; *Downing v. Ringer,* 7 Mo. 585; *Hamilton v. Scull,* 25 Ib. 165; *Higgins v. Higgins,* 55 Ib. 346; *Creekmore v. Chitwood,* 7 Bush (Ky.) 317; *Smith v. City of Albany,* 7 Lans. (N. Y.) 14; *Swords v. Owen,* 34 N. Y. 277; Story on Contracts, ( 2 Ed.) p. 539, § 614; *Fowler v. Scully,* 72 Penn. St. 456; *Holt v. Green,* 73 Penn. St. 198; 1 Story Eq. Jur., (4 Ed.) p. 49, § 61.

III. The promise made by defendant, Lizzie A. Callahan, to pay for the land, if such promise was made, was executory, and the facts as shown by the record, demand the application of the maxim, "*In pari delicto, &c.*" The general and almost universal rule is, that as between the parties to a contract entered into for the purpose of defrauding or hindering or delaying creditors and others of their

just dues or demands, the court will leave the parties where it finds them. They will not undo or in any manner interfere with one that is executed; nor will they enforce one that is either in whole or in part executory. Such is the rule with reference to all illegal contracts, whether rendered so by the common or the statute laws of the land. *Downing v. Ringer*, 7 Mo. 586; *Partlett v. Vinor*, Carthew 252; *Fenton v. Ham*, 35 Mo. 409; *Peltz v. Long*, 40 Mo. 532; *Adams Ex. Co. v. Reno*, 48 Mo. 267; *Hickman v. Benson*, 8 Mo. 8; *Hayden v. Little*, 35 Mo. 418; *Pacific R. R. v. Seely*, 45 Mo. 212; *Harwood v. Knapper*, 50 Mo. 456; *Inhabitants of Worcester v. Eaton*, 11 Mass. 375; *Smith v. Hobbs*, 1 Fairfield (Maine) 71; *Nellis v. Clark*, 20 Wend. 24; *Church v. Muir*, 33 N. J. 319; *McClure v. Purcell*, 3 A. K. Marshall 61; *Norris v. Norris*, 9 Dana 318; *Smead v. Williamson*, 16 B. Monroe 492; *Marksbury v. Taylor*, 10 Bush (Ky.) 520; *Bailey v. Milner*, 35 Georgia 330; *Adams v. Barrel*, 5 Ib. 404; *Green v. Godfrey*, 44 Maine 25; *Andrews v. Marshall*, 48 Ib. 26; *Hoover v. Pierce*, 26 Miss. 627; *Goudy v. Gebhart*, 1 Ohio St. 262; *Lewis v. Welch*, 14 N. H. 294; *Boden v. Murphy*, 10 Ala. 804; *Walton v. Bonham*, 24 Ib. 513; *Murphy v. Hubbert*, 16 Penn. St. 50; *Smith v. City of Albany*, 7 Lans. N. Y. 14; *Sweet v. Tinslar*, 52 Barb. 271; *Stanley v. Nelson*, 28 Ala. 514; *Milton v. Hayden*, 32 Ala. 30; *Bull v. Harragan*, 17 B. Monroe 349; *Wheeler v. Russell*, 17 Mass. 258; Roberts on Fraudulent Conveyances pp. 442 to 451; Bump on Fraud. Con. 442 to 452; Chitty on Contracts, (7 Am. Ed.) 657, 692 to 698, and notes, 971 to 978, and notes; Broom's Legal Maxims, (5 Am. Ed.) 495 to 499, top paging, also 484 to 489; *Collins v. Blantern*, 2 Wils. 347; *Keir v. Leeman*, 6 Q. B. 308; 9 Ib. 371; *Armstrong v. Armstrong*, 3 Myl. & Keen. 64; *Holman v. Johnson*, Cowper 343; *Jackson v. Duchaire*, 3 T. R. 552; *Higgins v. Pitt*, 4 Exch. 315; *Simpson v. Bloss*, 7 Taunt. 246; *Mallalieu v. Hodgson*, 16 Q. B. 681.

*H. C. Wallace* for defendant in error, Hall.

John Hall has nothing in common with the other defendants in this case, and only asks to be protected against any vendor's lien being enforced against the forty acres purchased by him of plaintiff at the administrator's sale. On the plainest principles of equity plaintiff is estopped to claim a lien against this land, having once sold it and received the money for it. If the court should decree that the lien be enforced against Hall's forty, then he prays that he may be subrogated to the lien, and the plaintiff may be ordered to pay him out of the proceeds of the sale the amount of his purchase money with interest.

HENRY, J.—In allowing Hall and Jordan to be made parties defendant, the court committed no error. Two hundred of the six hundred acres of land, against which plaintiff is seeking to enforce a vendor's lien, had, by him as administrator of the vendor's estate, been sold and conveyed to Hall and Jordan, who were in possession thereof under that conveyance. Whether the title which they acquired by purchase from the administrator be good or bad, they had a sufficient estate in the land to be materially interested in the result of the suit, such an interest as warranted the court in permitting them to become parties defendant.

Each of them in his answer denies that Mrs. Callahan owed or ever promised to pay to plaintiff's intestate any sum of money whatever for the lands conveyed to her by him, and alleges that it was not a real but a pretended sale, the sole purpose of both grantor and grantee having been to defraud the creditors of the grantor. It has been held in this State in the cases of *Hamilton v. Scull's Admr.*, 25 Mo. 166; *Fenton v. Ham*, 35 Mo. 410, and *Harwood v. Knapper*, 50 Mo. 456, that in a suit for the purchase money the vendee of goods, or the grantee of lands, may plead

and successfully defend himself, on the ground that the sale was made to hinder and defraud creditors.

Speaking for myself, and not for my associates, I think the weight of authority and reason against that doctrine, but in the case at bar the evidence of the fraudulent character of the conveyance was admissible, on the part of Jordan and Hall, to show that no debt was incurred by the grantee. They did not claim under the deed from Nutter to Mrs. Callahan, but adversely to it, and nothing in that deed estopped them from pleading the truth, even though it contradicted the deed.

If Mrs. Callahan incurred no debt by the transaction between her and Nutter, there could be no vendor's lien; and that she did not agree to pay any sum of money to Nutter for the land, and that it was understood between her and Nutter that by accepting that conveyance, she came under no obligation to him to pay the purchase money, the evidence leaves no room for doubt.

The deed states the consideration to have been $13,000, but in the deed the grantor acknowledges its receipt. No note or other written evidence of her indebtedness, is taken by the grantor from the grantee, no promise to pay is proven, and to divers persons, at different times and places he stated that Mrs. Callahan had paid him in full for the land. In the presence of a witness, at their residence, they performed the idle ceremony, she of paying, and he of receiving a sum of money which they then stated was the purchase money for the land. While a jury might have found from the evidence that Mrs. Callahan never paid the amount of purchase money specified in the deed, we think that no jury could have found, had that issue been submitted, that she ever agreed to pay that or any other sum. The evidence establishes clearly that it was a conveyance made for the sole purpose of defrauding the creditors of Nutter.

Whether Nutter's wife, who had sued him for a divorce and had procured an allowance of alimony *pendente*

*lite* then unpaid, is to be regarded as a creditor within the meaning of the statute, is a question which need not be determined, for whether the deed was made to defraud others who had claims against him, or to embarrass his wife in her divorce suit, the evidence shows that Mrs. Callahan incurred no obligation to pay any sum of money for the land. These remarks are exclusively applicable to the case betwixt the plaintiff and the defendants Hall and Jordan.

As to the other four hundred acres, a different question is presented. Mrs. Callahan admits in her answer that she did agree to pay Nutter $13,000 for the lands, but avers that she paid it to Nutter in his life time. She does not allege fraud in the transaction, but that the conveyance was made in good faith, and that she paid a valuable and an adequate consideration. She could not avail herself of the evidence on the issue made between the plaintiff and Hall and Jordan, as to her promise to pay purchase money for the land. Her answer admitting that she had agreed to pay it excludes her from the benefit of the evidence on that issue. *Capital Bank v. Armstrong*, 62 Mo. 65. Admitting that under the decisions of this State, *supra*, she could have relied upon the fraud in the conveyance as a defense to the action, she did not, nor could Hall and Jordan, or her husband, Callahan, make that defense for her. Her husband, in his separate answer, relies upon the fraud in the conveyance, but he is in privity with his wife, claims under her, and his interest in the land as tenant by the courtesy, or his life estate as husband, is subject to any liens with which the lands were affected before their intermarriage.

With the concurrence of the other judges, the judgment is reversed, and the cause remanded to be proceeded with in conformity to this opinion.

REVERSED.